# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JERRY GREEN and LINDA PETROU, *Plaintiffs*, v. KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina Board of Elections, *Defendant*. | **COMPLAINT** Case No. 3:20-CV-493 |

Plaintiffs, Jerry Green and Linda Petrou, bring this action under the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. §20507, against Defendant for declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

1. Section 8 of the NVRA requires States to maintain clean and accurate voter-registration records.

2. North Carolina has failed to live up to this requirement.

3. At least 40 counties in North Carolina have registration rates that far eclipse the national and statewide voter-registration rate in recent elections. Nine counties—Brunswick, Cabarrus, Currituck, Dare, Durham, Johnston, Mecklenburg, Union, and Wake—have more active registered voters than adult citizens over the age of 18. An additional 31 counties—Alamance, Buncombe, Camden, Carteret, Catawba, Cherokee, Clay, Davie, Forsyth, Franklin, Gaston, Guilford, Halifax, Haywood, Henderson, Iredell, Lincoln, Macon, Madison, Mitchell, Moore, Nash, New Hanover,

Orange, Pender, Perquiman, Polk, Rowan, Transylvania, Wilson, and Yancey—have active voter registration rates that exceed 90 percent of adult citizens over the age of 18.

4. Based on this and other evidence, Defendant is failing to make a reasonable effort to conduct appropriate list maintenance as required by the NVRA.

## JURISDICTION AND VENUE

5. The Court has subject-matter jurisdiction because this case alleges violations of the NVRA. 28 U.S.C. §1331; *see Ex parte Young*, 209 U.S. 123 (1908).

6. Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred in this District and because Defendant "resides" here. 28 U.S.C. §1391.

## PARTIES

7. Plaintiff Jerry Green is a duly registered North Carolina voter who lives in Buncombe County. Green is a former school principal who regularly votes in North Carolina's primary and general elections. He plans to vote in North Carolina's upcoming elections, including for U.S. Senate, and other local and statewide offices and ballot measures.

8. Green has long been an active member of the Republican Party. He works in North Carolina to advance conservative policies and to help elect Republican candidates. Green has served, among other roles, as precinct chair and chair of the

Buncombe County Republican Party. He remains an active member of the Buncombe County Republican Party.

9. Plaintiff Linda Petrou is a duly registered North Carolina voter who lives in Forsyth County. Petrou regularly votes in North Carolina's primary and general elections. She plans to vote in North Carolina's upcoming elections, including for U.S. Senate, and other local and statewide offices and ballot measures.

10. Petrou has long been an active member of the Republican Party. She has served on the executive board of the Forsyth County Republican Women and on the leadership team for Senator Thom Tillis' 2020 reelection campaign. She is a standing-committee member of the National Federation of Republican Women. And she is the vice chair of the Forsyth County Republican Party for the sixth congressional district. She has challenged illegal votes in the past, including successfully challenging an absentee ballot cast in the name of a dead person who improperly remained on the rolls.

11. Because Defendant does not maintain accurate voter rolls, ineligible voters can and do vote in North Carolina elections. Those votes dilute Plaintiffs' legitimate votes. And North Carolina's inaccurate rolls undermine Plaintiffs' confidence in the integrity of North Carolina elections, which also burdens their right to vote. Plaintiffs' votes are diluted, and their confidence undermined, no matter which political party or candidate the ineligible individuals vote for.

12. Because Defendant does not maintain accurate voter rolls, Plaintiffs must spend more of their time and resources monitoring North Carolina's elections for fraud

and abuse, mobilizing voters to counteract it, educating the public about election-integrity issues, and persuading elected officials to improve list maintenance. Plaintiffs also must spend more of their time and resources on get-out-the-vote efforts for like-minded individuals—eligible voters who, because Defendant does not maintain accurate voter rolls, lack confidence in the accuracy and integrity of North Carolina's elections. The time and resources that Plaintiffs divert to these activities would otherwise be spent on other projects and activities that would advance their goals.

13. Defendant, Karen Brinson Bell, is the Executive Director of the North Carolina State Board of Elections. She is the State's chief election officer, N.C. Gen. Stat. §163-27(d), and she is responsible for the statewide list maintenance required by the NVRA, 52 U.S.C. §20509. Director Bell is sued in her official capacity.

## BACKGROUND

### I. Statutory Background

14. Congress enacted the NVRA "to protect the integrity of the electoral process." 52 U.S.C. §20501(b)(3). Specifically, section 8 was enacted "to ensure that accurate and current voter registration rolls are maintained." §20501(b)(4).

15. Retaining voter rolls bloated with ineligible voters harms the electoral process, heightens the risk of electoral fraud, and undermines public confidence in elections. "Confidence in the integrity of our electoral processes is," in turn, "essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

16. Section 8 obligates States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. §20507(a)(4). "[F]ederal law makes this removal mandatory." *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1842 (2018).

17. Each State's program for maintaining voter-registration lists must be "uniform, non-discriminatory, and in compliance with the Voting Rights Act." 52 U.S.C. §20507(b)(1).

18. Specifically, section 8 requires States to remove individuals from the voter rolls who have become ineligible due to "death" or due to "a change in … residence" outside their current voting jurisdiction. 52 U.S.C. §20507(4)(A)-(B).

19. The Help America Vote Act (HAVA) also requires States to adopt computerized statewide voter registration lists and maintain them "on a regular basis" in accordance with the NVRA. 52 U.S.C. §21083(a)(2)(A).

20. States must "ensure that voter registration records in the State are accurate and are updated regularly"—an obligation that includes a "reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." 52 U.S.C. §21083(a)(4).

21. HAVA's list-maintenance requirements include coordination with "State agency records on death" and "State agency records on felony status" to facilitate the removal of individuals who are deceased or rendered ineligible under state law due to a felony conviction. 52 U.S.C. §21083(a)(2)(A)(ii)(I)-(II).

22. According to the bipartisan Carter-Baker Commission, "registration lists lie at the root of most problems encountered in U.S. elections." Inaccurate voter rolls that contain "ineligible, duplicate, fictional, or deceased voters" invite "fraud." "While election fraud is difficult to measure" (because many cases go undetected, uninvestigated, or unprosecuted), "it occurs." "In close or disputed elections, and there are many, a small amount of fraud could make the margin of difference." And "the perception of possible fraud contributes to low confidence in the system." The Supreme Court agrees. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008) (lead op. of Stevens, J.).

23. Other courts and experts have likewise recognized that voter fraud is both real and notoriously "difficult to detect and prosecute." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 396 (5th Cir. 2020). According to Justice Stevens, "the risk of voter fraud"—particularly with "absentee ballots"—is "real." *Crawford*, 553 U.S. at 195-96; *accord Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004) ("Voting fraud is a serious problem in U.S. elections … and it is facilitated by absentee voting."); *Veasey v. Perry*, 71 F. Supp. 3d 627, 641 (S.D. Tex. 2014) (finding broad "agreement that voter fraud actually takes place in abundance in connection with absentee balloting"); *Tex. Democratic Party*, 961 F.3d at 414 (Ho, J., concurring) ("[C]ourts have repeatedly found that mail-in ballots are particularly susceptible to fraud."). As Professor Michael Morley puts it, "election officials can neither exercise control over absentee ballots once they are mailed out to voters, nor ensure that they have been received and cast by the voters

entitled to do so." Stated differently, "absentee voting is to voting in person as a take-home exam is to a proctored one." *Griffin*, 385 F.3d at 1131.

24. North Carolina, too, has experienced known cases of voter fraud.

25. But the known cases are a small percentage of the overall cases because North Carolina is not well equipped to detect fraud. North Carolina has no system in place to detect when people vote in multiple States, for example. While the Electronic Registration Information Center can reveal whether voters have moved out of state, 40% of States do not participate in that voluntary program—including North Carolina.

26. Recognizing these concerns, the NVRA includes a private right of action. It empowers any "person who is aggrieved by a violation" to "provide written notice of the violation to the chief election official of the State involved." 52 U.S.C. §20510(b)(1). "If the violation is not corrected within 90 days after receipt of a notice, … the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief." §20510(b)(2).

## II. Defendant's Obligations

27. Federal law makes the Executive Director of the North Carolina State Board of Elections primarily responsible for list maintenance.

28. The NVRA requires each State to "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under" the law. 52 U.S.C. §20509.

29. North Carolina law designates the Executive Director of the North Carolina State Board of Elections as the State's chief election officer. N.C. Gen. Stat. §163-27(d).

30. Ultimate responsibility for coordinating and overseeing all list-maintenance activities rests with the Executive Director. A chief election official "may not delegate the responsibility to conduct a general program to a local official and thereby avoid responsibility if such a program is not reasonably conducted." *United States v. Missouri*, 535 F.3d 844, 850 (8th Cir. 2008).

31. Indeed, "the NVRA's centralization of responsibility counsels against … buck passing." *Scott v. Schedler*, 771 F.3d 831, 839 (5th Cir. 2014). Courts have rejected the view that, "once the state designates" a local entity to assist with complying with federal law, "her responsibility ends." *Harkless v. Brunner*, 545 F.3d 445, 452 (6th Cir. 2008). "[I]f every state passed legislation delegating" their responsibilities "to local authorities, the fifty states would be completely insulated from any enforcement burdens." *Id.*

### III. Defendant's Failure to Meet Her List-Maintenance Obligations

32. An estimated "24 million voter registrations in the United States—about one in eight—are either invalid or significantly inaccurate." *Husted*, 138 S. Ct. at 1838. North Carolina is no exception. It is failing to meet its list-maintenance obligations.

33. Based on data gathered from the U.S. Census Bureau's 2014-18 American Community Survey and a February 2020 count of active registered voters from the

North Carolina State Board of Elections, ten North Carolina counties have more active registered voters than voting-eligible citizens, and 26 others have suspiciously high rates of active voter registration.

34. Comparing the active registered voter count as of May 2020 to the 2015-19 American Community Survey reveals that nine counties have greater than 100% registration: Brunswick (104.3%), Cabarrus (101.3%), Currituck (100.5%), Dare (104.1%), Durham (103.1%), Johnston (103.8%), Mecklenburg (105.3%), Union (100.4%), and Wake (104.2%). In other words, there are more registered voters than eligible voters.

35. Additionally, 31 other counties across the State purport to have more than 90% (in some cases, approaching 100%) of their citizen voting-age populations registered and active: Alamance (91.3%), Buncombe (99.3%), Camden (90.9%), Carteret (92.2%), Catawba (90.5%), Cherokee (93.8%), Clay (99.7%), Davie (95.6%), Forsyth (97.1%), Franklin (94%), Gaston (90.6%), Guilford (94.9%), Halifax (90.5%), Haywood (90.8%), Henderson (95.7%), Iredell (99.2%), Lincoln (98.1%), Macon (96.2%), Madison (94.6%), Mitchell (91.5%), Moore (95.9%), Nash (92.3%), New Hanover (94.2%), Orange (97.4%), Pender (96.9%), Perquiman (90.6%), Polk (92%), Rowan (90.2%), Transylvania (91.5%), Wilson (90.6%), and Yancey (99.2%).

36. These registration rates are abnormally—or in the case of counties with rates greater than 100%, impossibly—high.

37. According to the U.S. Census Bureau, 66.9% of the citizen voting-age population was registered nationwide in the November 2018 election.

38. Similarly, 70.3% of the citizen voting-age population was registered in the November 2016 election.

39. In North Carolina, the U.S. Census Bureau reports statewide voter-registration rates for the 2018 and 2016 elections as 69.3% and 74.6% of the citizen voting-age population, respectively.

40. Thus, these 40 counties are significant outliers, reporting voter-registration rates 20 to 30 percentage points higher than the national figures, and 15 to 25 percentage points higher than the state figures.

41. There is no evidence that these counties experienced above-average voter participation compared to the rest of the country or State. The only explanation for these discrepancies is substandard list maintenance.

42. "[S]ignificantly high registration rates," like these, are a telltale sign that clerks are "not properly implementing a program to maintain an accurate and current voter registration roll, in violation of the NVRA." *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 791 (W.D. Tex. 2015).

43. For example, the United States sued Indiana for violating the NVRA in 2006, noting in its complaint that "25 counties had registration totals of 90-95%" of their voting-age population. Indiana quickly confessed to violating the NVRA in a consent decree.

44. Judicial Watch and True the Vote sued Indiana in 2012, explaining in their complaint that "26 counties … have voter registration rolls that contain between 90% and 100% of TVAP." Indiana agreed to conduct a significant, statewide process to clean up its voter rolls.

45. Also in 2012, Judicial Watch and True the Vote sued Ohio under the NVRA, alleging that "thirty-one counties … have voter registration rolls that contain between 90% and 100% of total voting age population." Ohio agreed to implement heightened review of the accuracy of its voter rolls.

46. In December 2019, the Public Interest Legal Foundation sued Detroit under the NVRA, alleging that "Detroit has more registered voters than adult citizens of voting age (106%)." The suit was dismissed on June 29, 2020, because Detroit removed substantial numbers of invalid registrations.

47. In June 2020, Tony Daunt sued Michigan's Secretary of State and Director of Elections, alleging that "[a]t least 16 counties in Michigan have ... more active registered voters than ... adult citizens who are over the age of 18" or have "active voter registration rates that exceed 90 percent of adult citizens over the age of 18." The district court denied several motions to dismiss. *See Daunt v. Benson*, Docs. 44, 46, No. 1:20-cv-522 (W.D. Mich. 2020). The suit was voluntarily dismissed on February 16, 2021, because the Secretary agreed to slate 177,000 voter registrations for cancellation and implement other list-maintenance reforms. *See id.*, Doc. 58.

48. North Carolina's rolls are similarly inflated. In fact, compared to other States, North Carolina is one of the few States whose rolls are currently becoming *more* inflated in recent years.

49. North Carolina's rolls are become more inflated despite a growing need for the State to conduct list maintenance. Individuals used to be able to challenge individual registrations in North Carolina, for example, but no longer can do so.

50. Defendant's failure to maintain accurate voter rolls violates federal law and jeopardizes the integrity of the State's upcoming elections.

### IV. Plaintiffs' Statutory Notice

51. Under the NVRA, "Plaintiffs have [statutory] standing assuming they provided proper notice within the meaning of 52 U.S.C. §20510(b)(1)." *Bellitto v. Snipes*, 221 F. Supp. 3d 1354, 1362 (S.D. Fla. 2016).

52. On May 4, 2020, Plaintiffs mailed a statutory notice letter to Executive Director Bell, notifying her that at least 36 North Carolina counties were in violation of section 8 and formally requesting that she correct the violations within 90 days. *See* Exh. A.

53. Plaintiffs have since received updated comparisons based on recently available data, revealing that 40 North Carolina counties are in violation of section 8. Those numbers are reflected above.

54. The notice letter stated that Plaintiffs "hope[d] to avoid litigation and would welcome immediate efforts by [Defendant] to bring North Carolina into compliance with Section 8."

55. Plaintiffs asked Director Bell to establish "a comprehensive and nondiscriminatory list maintenance program in compliance with federal law" and to "identify and remove [several] categories of individuals from the official lists of eligible voters."

56. Plaintiffs asked Director Bell to "respond in writing within 45 days of the date of this letter," "fully describ[ing] the efforts, policies, and programs [Defendant is] taking, or plan[ned] to undertake prior to the 2020 general election to bring North Carolina into compliance with Section 8" and "not[ing] when [Defendant] plan[ned] to begin and complete each specified measure and the results of any programs or activities you have already undertaken."

57. Additionally, Plaintiffs requested that Director Bell advise them "what policies are presently in place, or will be put in place, to ensure effective and routine coordination of list maintenance activities with the federal, state, and local entities" and to provide them with "a description of the specific steps [she] intend[ed] to take to ensure routine and effective list maintenance on a continuing basis beyond the 2020 election."

58. Plaintiffs also requested that Defendant take steps to preserve documents as required by section 8(i) of the NVRA, 52 U.S.C. §20507(i)(1)-(2), and other federal

- 13 -
Case 3:21-cv-00493-RJC-DCK   Document 1   Filed 09/17/21   Page 13 of 15

law. *See, e.g.*, *In re Enron Corp. Sec., Derivative & Erisa Litig.*, 762 F. Supp. 2d 942, 963 (S.D. Tex. 2010) ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.").

59. Finally, the notice letter stated that Plaintiffs would file a lawsuit under 52 U.S.C. §20510(b)(2) if the identified violations were not corrected.

60. Defendant responded to the notice letter on July 31, 2020. Defendant criticized Plaintiffs' statistics (but provided none of her own), and denied that inflated voter rolls were evidence of an NVRA violation.

## COUNT
### Violation of the NVRA

61. Plaintiffs repeat and reallege each of their prior allegations.

62. Defendant has failed to make reasonable efforts to conduct voter list-maintenance as required by §20507(a)(4) of the NVRA.

63. Plaintiffs have suffered irreparable injuries as a direct result of Defendant's violation of section 8 of the NVRA.

64. Plaintiffs will continue to be injured by Defendant's violations of section 8 of the NVRA until Defendant is enjoined from violating the law.

65. Plaintiffs have no adequate remedy at law.

**WHEREFORE**, Plaintiffs respectfully requests that this Court enter judgment in favor of Plaintiffs and against Defendant and provide the following relief:

A. A declaratory judgment that Defendant is in violation of section 8 of the NVRA;

B. An injunction requiring Defendant to fully comply with any existing procedures that North Carolina has in place to ensure ineligible voters are identified and removed from the rolls;

C. An injunction requiring Defendant to develop and implement additional reasonable and effective registration list-maintenance programs to cure their failure to comply with section 8 of the NVRA and to ensure that ineligible registrants are not on the voter rolls;

D. Plaintiffs' reasonable costs and expenses of this action, including attorneys' fees; and

E. All other further relief that Plaintiffs may be entitled to.

Respectfully submitted,

Dated: September 17, 2021     */s/ Robert N. Hunter, Jr.*
Robert N. Hunter, Jr. (NCSB 5679)
William S. Consovoy     HIGGINS BENJAMIN, PLLC
Cameron T. Norris     301 N. Elm St., Ste. 800
Tiffany H. Bates     Greensboro, NC 27401
CONSOVOY MCCARTHY PLLC     (336) 275-7577
1600 Wilson Blvd., Ste. 700     rnhunterjr@greensborolaw.com
Arlington, VA 22209
will@consovoymccarthy.com
cam@consovoymccarthy.com
tiffany@consovoymccarthy.com

Jason Torchinsky
HOLTZMAN VOGEL
    JOSEFIAK TORCHINSKY PLLC
45 North Hill Drive, Ste. 100
Warrenton, VA 20186
(540) 341-8800
JTorchinsky@hvjt.law

*Counsel for Plaintiff*