IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:21-CV-493-RJC-DCK

| | |
|---|---|
| JERRY GREEN, and LINDA PETROU, | ) |
| Plaintiffs, | ) |
| v. | ) MEMORANDUM AND |
| | ) RECOMMENDATION |
| KAREN BRINSON BELL, in her official capacity as Executive Director of the North Carolina Board of Elections, | ) |
| Defendant. | ) |

**THIS MATTER IS BEFORE THE COURT** on "The League Of Women Voters Of North Carolina And The North Carolina A. Philip Randolph's Motion To Intervene As Defendants" (Document No. 15 ) and "Defendant's Motion To Dismiss" (Document No. 19). These motions have been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. §636(b), and are now ripe for disposition. Having carefully considered the arguments, the record, and applicable authority, the undersigned will respectfully recommend that the motion to dismiss be <u>granted</u> and that the motion to intervene be <u>denied as moot</u>.

## I. BACKGROUND

### A. Factual Background

On or about May 4, 2020, Jerry Green ("Green") and Linda Petrou ("Petrou") (together, "Plaintiffs") sent a letter (the "Notice") to Karen Brinson Bell, Executive Director of the North Carolina Board of Elections ("Bell" or "Defendant"). The Notice asserts that "36 North Carolina counties appear to be in violation of Section 8" of the National Voter Registration Act, 52 U.S.C. § 20501 *et seq.* (the "NVRA"). (Document No. 1-1, p. 2). Plaintiffs contend that comparing "voter

registration records with the U.S. Census Bureau's 2015-2018 American Community Survey of citizen voting age population, . . . strongly suggests that these counties are not conducting appropriate list maintenance to ensure the voter registration roll is accurate and current, as required by federal law." Id.

Plaintiffs contend that the named counties' high rates of voter registration are suspicious, and "point to deficient list maintenance" that "jeopardizes the integrity of the upcoming 2020 federal election." (Document No. 1-1, p. 4). The Notice asserts that Plaintiffs "hope to avoid litigation" and "ask that [Defendant] establish, if one has not already been initiated, a comprehensive non-discriminatory list maintenance program in compliance with federal law." (Document No. 1-1, pp. 2, 5).

In response, Defendant sent a letter to Plaintiffs' counsel on or about July 31, 2020. (Document No. 21-2). Defendant's letter, *inter alia*, informs Plaintiffs that a comprehensive non-discriminatory list maintenance program already exists. (Document No. 21-2); see also (Document No. 21-1). Defendant explains that "North Carolina has adopted detailed statutory requirements, which are mostly found in section 163-82.14 of the General Statutes" that direct that "the State Board must carry out a 'uniform program' of list maintenance that is 'non-discriminatory' and complies with the Voting Rights Act of 1965, as amended, and the NVRA." (Document No. 21-2, p. 4) (citing N.C.Gen.Stat. 163-82-14(a)). Defendant thoroughly describes North Carolina's voter list maintenance program, including how it addresses: voters who have moved; deceased voters; and voters ineligible due to a felony conviction. See (Document No. 21-2, pp. 4-5).

In addition, Defendant's letter notes that Plaintiff's Notice compares data regarding alleged high voter registration rates from "different periods of time and different populations, and does not

2

account for margins of error." (Document No. 21-2, p. 6). Defendant further notes that "the NVRA does not establish any numerical threshold for complying with Section 8." (Document No. 21-2, p. 7). Moreover, Defendant states

> the NVRA itself prevents states from removing significant numbers of voters that a state suspects as being ineligible. For voters that have not confirmed their ineligibility for moving out of jurisdiction, the NVRA sets forth a lengthy address-confirmation process that causes a four-year delay, at the bare minimum, in removing these voters. *See* 52 U.S.C. § 20507(d); EAVS 2018 Report at 47, 49, 52. . . . The NVRA also prevents states from conducting the systematic removal of voters during long periods of time—90 days before every federal primary and general election (i.e., six months out of every two years). 52 U.S.C. § 20507(c)(2)(A).

(Document No. 21-2, p. 7).

Defendant concludes that Plaintiffs' Notice "fails to explain how the State or county boards are violating the NVRA," and thus "affords us no opportunity to attempt to comply with the law, as you interpret it." (Document No. 21-2, p. 9).

"Plaintiffs provided no reply until filing the Complaint **14 months later**." (Document No. 20, pp. 9-10) (emphasis added).

**B. Procedural Background**

Plaintiffs' "Complaint" (Document No. 1) was filed on September 17, 2021. The Complaint seeks declaratory and injunctive relief under the NVRA. (Document No. 1, p. 1). The Complaint alleges that "[a]t least 40 counties in North Carolina have registration rates that far eclipse the national and statewide voter-registration rate in recent elections." Id. Plaintiffs conclude that "Defendant is failing to make a reasonable effort to conduct appropriate list maintenance required by the NVRA." (Document No. 1, pp. 2, 14).

Plaintiffs allege that "[b]ecause Defendant does not maintain accurate voter rolls, ineligible voters can and do vote in North Carolina elections." (Document No. 1, p. 3). Plaintiffs contend

3

that Defendant's alleged failures: dilute their votes; undermine their confidence in the integrity of North Carolina elections; and cause them to spend more time monitoring elections. Id. Plaintiffs further contend that the injuries they have suffered are "irreparable." (Document No. 1, p. 14).

The Complaint notes that Plaintiffs sent Defendant "a statutory notice letter" on May 4, 2020, requesting that "she correct the violations within 90 days." (Document No. 1, p. 12). The "notice letter stated that Plaintiffs would file a lawsuit under 52 U.S.C. § 20510(b)(2) if the identified violations were not corrected." (Document No. 1, p. 14). The Complaint asserts one claim: "Violation of the NVRA." Id.

"The League Of Women Voters Of North Carolina And The North Carolina A. Philip Randolph's Motion To Intervene As Defendants" (Document No. 15) was filed on November 12, 2021. The League Of Women Voters Of North Carolina and the North Carolina A. Philip Randolph Institute ("proposed Defendant-Intervenors") "oppose any requested court-ordered purging of voting rolls in North Carolina," and intend to "seek a judgment on the pleadings in favor of Defendants." (Document No. 15, p. 1). Proposed Defendant-Intervenors contend that the requested court-ordered "list maintenance" is not appropriate or required under the NVRA, "a federal statute designed to make it easier for citizens to become and remain registered to vote." (Document No. 1, pp. 1-2).

"Plaintiffs' Opposition To Motion To Intervene" (Document No. 25) was filed on November 26, 2021. "Defendant's Response To Proposed Intervenors' Motion To Intervene" (Document No. 33) was filed on December 20, 2021, and states that Defendant opposes the motion "to the extent they seek to intervene as of right," but "takes no position on the motion to the extent

it seeks permissive intervention." (Document No. 33, p. 1). Proposed Defendant-Intervenors' "…Reply In Support Of Intervention" (Document No. 34) was filed on January 7, 2022.

"Defendant's Motion To Dismiss" (Document No. 19) was filed on November 15, 2021. Defendant seeks dismissal pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). The crux of Defendant's motion is that: (1) Plaintiffs lack standing due to inadequate presuit notice; (2) Plaintiffs lack standing due to lack of a concrete injury-in-fact; and (3) the Complaint fails to state a claim upon which relief can be granted. (Document No. 20). "Plaintiffs' Opposition To Motion To Dismiss" (Document No. 35) was filed on January 28, 2022; and the "Reply In Support Of Defendant's Motion To Dismiss" (Document No. 40) was filed on March 11, 2022.

The pending motions have been fully briefed and are ripe for review and a recommended disposition to the Honorable Robert J. Conrad, Jr.

## II. STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(1) seeks to dismiss a complaint for lack of subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1). The plaintiff has the burden of proving that subject matter jurisdiction exists. See Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). The existence of subject matter jurisdiction is a threshold issue the court must address before considering the merits of the case. Jones v. Am. Postal Workers Union, 192 F.3d 417, 422 (4th Cir. 1999). "The subject matter jurisdiction of federal courts is limited and the federal courts may exercise only that jurisdiction which Congress has prescribed." Chris v. Tenet, 221 F.3d 648, 655 (4th Cir. 2000) (citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994)).

When a defendant challenges subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), "the district court is to regard the pleadings as mere evidence on the issue, and may consider

evidence outside the pleadings without converting the proceeding to one for summary judgment." Richmond, 945 F.2d at 768. The district court should grant the Rule 12(b)(1) motion to dismiss "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id. See also, Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999).

### III. DISCUSSION

**A.  Dismissal**

In support of the "…Motion To Dismiss, Defendant provides an instructive summary of the National Voter Registration Act ("NVRA") and North Carolina's implementation of the NVRA. (Document No. 20, pp. 3-9). The undersigned includes portions of that summary as follows.

> Congress enacted the NVRA to "promote the exercise" of the right to vote and to overcome "discriminatory and unfair registration laws and procedures." 52 U.S.C. § 20501(a)(2)–(3). The NVRA requires states to expand voter registration opportunities, *Id.* §§ 20503–06, and imposes limits on states' ability to remove voters. *Id.* §§ 20507(a)(3), (b)–(d).
>
> With these provisions, Congress sought to minimize "'purge systems' [that] had been used to 'violate the basic rights of citizens,' particularly members of 'minority communities.'" *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021) (quoting S. Rep. No. 103-6, 18 (1993)). Thus, Congress designed the NVRA both to encourage voter registration, and "to ensure that once a citizen is registered to vote, he or she should remain on the voting rolls so long as he or she remains eligible to vote." S. Rep. No. 103-6 at 17. While Congress was "mindful of the need to keep accurate and current voter rolls," its overriding concern was that voter list-maintenance programs "can be abused and may result in the elimination of eligible voters from the rolls." *Id.* at 32.
>
> Section 8 of the NVRA includes numerous safeguards to prevent states from improperly removing eligible voters from the rolls. *See* 52 U.S.C. §§ 20507(a)–(e). . . .

Subsection (c) is known as the NVRA's "safe harbor" provision, *Bellitto v. Snipes*, 935 F.3d 1192, 1203 (11th Cir. 2019), because it establishes a process by which a state "may meet" the "reasonable effort" requirement outlined above, 52 U.S.C. § 20507(c)(1). That process entails sending an address-confirmation mailing to all voters for whom the U.S. Postal Service has a change-of-address notification on file. *Id.* § 20507(c)(1). Then, for voters who respond by confirming that they have moved out of the jurisdiction, a state may remove them from the rolls. *Id.* § 20507(d)(1)(A). For voters who do not respond to the mailing, a state may remove them from the rolls, but only if those voters fail to appear to vote in the jurisdiction in the two Federal general elections after the mailing. *Id.* § 20507(d)(1)(B). . . .

North Carolina implements the requirements of the NVRA through the State Board and the 100 county boards of elections. The State Board and its executive director oversee the conduct of elections and the coordination of the State's duties under the NVRA. N.C.G.S. §§ 163-22(a), -27(d), 28, -82.2, -82.11, -82.12. The county boards conduct elections and manage voter registration in their jurisdictions. *Id.* §§ 163-33, -82.1(b), -82.6(a), -82.7, -82.8, -82.9.

North Carolina has adopted a detailed statute that implements the list-maintenance provisions of the NVRA. *See* N.C.G.S. § 163-82.14. To remove deceased voters on the rolls, the statute requires the state health department to provide the State Board a list of North Carolina residents who have died each month. *Id.* § 163-82.14(b). The State Board then forwards those names to each county to which the names pertain, and the county boards remove those names from the voter rolls. *Id.* County boards may also remove the name of any deceased voter if the voter's near relative or estate representative provides a signed statement of the voter's death. *Id.*

The statute also prescribes a program that county boards must follow to update the records of voters who have moved. *Id.* § 163-82.14(d). County boards remove voters who have confirmed in writing that they have moved out of the jurisdiction. *Id.* § 163-82.14(d)(1). Otherwise, a county board may remove a voter for having moved only through the address confirmation mailing process outlined in section 8(d) of the NVRA: the county board first sends an address-confirmation notice to the voter's address, and if the voter does not respond to confirm their address and fails to appear to vote in the jurisdiction in the next two Federal elections, that voter will be removed from the rolls. *Compare id.* § 163-82.14(d)(2), with 52 U.S.C. § 20507(d)(1)(B). Such a mailing

7

Case 3:21-cv-00493-RJC-DCK   Document 44   Filed 01/24/23   Page 7 of 20

> program takes place "after every congressional election" and must be completed by April 15 of each odd-numbered year. N.C.G.S. §§ 16382.14(a), (d)(2). These mailings are sent "to every registrant . . . if the county board has not confirmed the registrant's address by another means." *Id.* § 163-82.14(d)(2).
>
> . . .
>
> Pursuant to N.C.G.S. § 163-82.14(a), the State Board has adopted a detailed policy to instruct county boards on carrying out the requirements outlined above. *See* N.C. State Bd. of Elections, Maintaining the Voter Registration Database in North Carolina (July 27, 2017), *available at* https://go.aws/2Boq4RQ (and attached for reference as Exhibit A).

(Document No. 20, pp. 3-6)

As noted above, Defendant asserts three main arguments in support of dismissal. (Document No. 20, p. 1). The undersigned finds the first argument regarding standing to be persuasive and a sufficient basis for dismissal of this action.

**Statutory Standing**

Defendant first argues that Plaintiffs have failed to provide clear notice of how Defendant allegedly violated the NVRA. (Document No. 20, p. 11). Defendant notes that "[a] person who is aggrieved by a violation" of the NVRA must "provide written notice of the violation to the chief election official of the State involved," and afford the election official an opportunity to correct the violation within 90 days." Id. (citing 52 U.S.C. § 20510(b)(1) and (2)).

Defendant contends that "'failure to provide notice is fatal' to a plaintiff's standing." Id. (quoting Bellitto v. Snipes, 221 F.Supp.3d 1354, 1362 (S.D.Fla. 2016 ) (quoting Scott v. Schedler, 771 F.3d 831, 836 (5th Cir. 2014))). Defendant notes that the "purpose of the notice requirement is to 'provide states in violation of the Act an opportunity to attempt compliance before facing litigation.'" Id. (quoting Ass'n of Cmty. Organizations for Reform Now v. Miller, 129 F.3d 833, 838 (6th Cir. 1997). Therefore, if a notice letter is "too vague to provide [the defendant] with 'an

8

Case 3:21-cv-00493-RJC-DCK     Document 44     Filed 01/24/23     Page 8 of 20

opportunity to attempt compliance,'" the notice will be insufficient to confer standing. Id. (quoting Scott, 771 F.3d at 836 (quoting Miller, 129 F.3d at 838)); and (citing Ohio A. Phillip Randolph Inst. v. Husted, 350 F.Supp. 3d 662, 672 (S.D. Ohio 2018)).

Here, Defendant argues that Plaintiffs' Notice is too vague to support its statutory purpose because it fails to explain how the NVRA was being violated. Id. (citing Document No. 1-1). Plaintiffs noted that the NVRA requires a "reasonable effort" to remove ineligible voters from the list of eligible voters, but Plaintiffs "did not identify what election administrators were doing that was unreasonable." (Document No. 20, p. 12) (citing Document No. 1-1, pp. 1-2). Even after Defendant responded to the Notice with "a detailed explanation of the list-maintenance procedures undertaken by the State and county boards, including a link to those policies, Plaintiffs still failed to provide any clarifying explanation." Id. (citing Document Nos. 21-1 and 21-2).

Next, Defendant notes that Plaintiffs' Notice "included alleged ratios of registered voters in 2020 versus the voting-age population in specific counties in a date range centered on 2016." Id. (citing Document No. 1-1, p. 3). Defendant argues that Plaintiffs' figures do not show a violation of the NVRA, and then observes that this Court found a similar statistical analysis was "too vague to provide them an opportunity to attempt compliance before facing litigation." Id. (quoting Judicial Watch, Inc. v. North Carolina, et al., 3:20-CV-211-RJC-DCK, 2021 WL 7366792, at *10 (W.D.N.C. Aug. 20, 2021). Defendant asserts that the Scott court also found "the statistics of registration rates were insufficient to notify the State how it was violating the NVRA's requirements." Id. (citing Scott, 771 F.3d at 836).

In addition, Defendant argues that Plaintiff's statistics do not support adequate notice because the NVRA *prevents* states from removing significant numbers of voters that are suspected of having moved for at least *four years*. (Document No. 20, pp. 12-13) (citing 52 U.S.C.

9

§20507(d)). Defendant notes that the U.S. Election Assistance Commission "repeatedly warns against drawing conclusions about NVRA compliance based on the registration rates in that report, precisely because of the lag time the NVRA requires for the removal of voters." (Document No. 20, p. 13) (citing U.S. Election Assistance Comm'n, Election Administration and Voting Survey, 2020 Comprehensive Report ("EAVS 2020 Report") at pp. 126, 135); See also Judicial Watch, 2020 WL 682372, at *8 (citing EAVS 2018 Report, pp. 47, 49)).

Defendant notes that this Court's "Memorandum And Recommendation" in Judicial Watch v. North Carolina relied on the EAVS 2018 Report and "found that 'if states should expect to see high voter registration rates, such information, without more, does not seem to provide adequate notice/evidence of non-compliance with the NVRA.'" Id. (quoting 2020 WL 682372, at *10).

Defendant observes that the NVRA "expressly sanctions a method of compliance with the 'reasonable effort' provision that misses a large portion of likely ineligible voters." (Document No. 20, p. 14). The Supreme Court has recognized that the process fails to reach up to 40% of people who move and that the "NVRA itself is 'partly responsible for inflated lists of registered voters.'" Id. (quoting Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 192 (2008) and citing Husted v. A. Philip Randolph Inst., 138 S.Ct. 1833, 1840 (2018)).

Another issue Defendant raises is that the figures cited in Plaintiffs' Notice are based on an estimated 2016 population, compared with voter registration figures from 2020. (Document No. 20, p. 14). As such, "Plaintiffs are not comparing apples to apples because they fail to account for four years of population growth." Id. Moreover, because 2020 was a Presidential election year, the registration figures "reflect the height of voter registration before a major general election." (Document No. 20, p. 15). Based on the NVRA's pre-removal procedures that require waiting for two federal elections of inactivity to remove voters, large numbers of voters would not

10

be removed until *after* the 2020 general election. Id. (citing N.C. State Bd. of Elections, County Boards of Elections Begin Regular Voter List Maintenance Processes (Jan. 14, 2021), https://www.ncsbe.gov/news/pressreleases/2021/01/14/county-boards-elections-begin-regular-voter-list-maintenance (estimating that "380,000 inactive voters" would be removed in early 2021 due to the NVRA process).

Defendant concludes that "Plaintiffs utilized artificially lower population numbers from 2016 as the denominator, and artificially higher registration rates from early 2020 as the numerator, in order to generate artificially higher rates of voter registration." Id. According to Defendant, the figures cited by Plaintiffs do not demonstrate a lack of compliance with the NVRA, and therefore, do not provide an "opportunity to attempt compliance before facing litigation." (Document No. 20, pp. 15-16) (quoting Miller, 129 F.3d at 838). "Plaintiffs therefore lack standing." (Document No. 20, p. 16).

In response, Plaintiffs assert that the "NVRA allows individuals to sue once the State's chief election official receives 'written notice of the violation'" and that "[n]o one disputes that, before filing this lawsuit, Plaintiffs gave Director Bell written notice of the allegations that now appear in their complaint." (Document No. 35, p. 11) (quoting 52 U.S.C. § 20510(b)(1)-(2)). Plaintiffs argue that their Notice (Document No. 1-1) "satisfied the NVRA" because it: (1) put Defendant on "statutory notice" that litigation was forthcoming; (2) identified the exact provision of the NVRA that the State is allegedly violating; (3) identified Plaintiffs by name; and (4) explained the reason why Plaintiffs believe there is a violation. (Document No. 35, p. 12).

Plaintiffs note that their "counsel filed a virtually identical notice for a voter in Michigan." Id. (comparing Document No. 1-1 and Document No. 35-2). Plaintiffs rely heavily on the resulting oral opinion in Daunt v. Benson denying a motion to dismiss for insufficient notice and urge this

Court to do the same. Id. (citing Daunt v. Benson, No. 1:20-CV-522-RJJ-RSK (W.D. Mich. Sept. 3, 2020) (oral opinion); see also (Document No. 35-1). Plaintiffs note that the Michigan court found that the notice in that case provided a "'fairly detailed statement of why the plaintiff thinks there's a problem with the Michigan voter registration list . . . under Section 8' – specifically, that certain counties 'have more registered voters than eligible voters . . . based on the census data.'" Id. (quoting Daunt, Document No. 35-1, pp. 16-17). Plaintiffs contend that a decision in ACRU v. Martinez-Rivera, provides similar support for their position that a notice alleging that a county's voter rolls had more registered voters than eligible voters is sufficient to bring a lawsuit. Id. (citing ACRU v. Martinez-Rivera, 166 F.Supp.3d 779, 795 (W.D.Tex. 2015)).

According to Plaintiffs, the NVRA does not require the specificity demanded by Defendant. (Document No. 35, p. 13). Plaintiffs argue that a presuit notice does not require detailed allegations; rather, a notice "need only state the 'general requirement' that the State is violating and the basic 'reasons' for that conclusion. Id. (citing Judicial Watch v. King, 993 F.Supp.2d 919, 922 (S.D.Ind. 2012)); see also Voter Integrity Proj. NC, Inc. v. Wake Cty. Bd. of Elections, 301 F.Supp. 3d 612, 617-18 (E.D.N.C. 2017), Action NC v. Strach, 216 F. Supp. 3d 597, 619-20 (M.D.N.C. 2016), and Nat'l Council of La Raza v. Cegavske, 800 F.3d 1032, 1044 (9th Cir. 2015).

Plaintiffs further argue that Defendant "does not cite a single case deeming a notice like Plaintiffs' insufficient – or a single case deeming any notice too 'vague' to satisfy the NVRA." (Document No. 35, p. 13). However, Plaintiffs later acknowledge that the undersigned "recommended dismissing the complaint in *Judicial Watch* for insufficient notice." (Document No. 35, p. 15) (citing Judicial Watch, Inc. v. North Carolina State Board of Elections, et al., 3:20-CV-211-RJC-DCK, 2021WL 7366792 (W.D.N.C. Aug. 20, 2021)). Plaintiffs disagree with the

12

undersigned's decision in Judicial Watch and suggest that this Court should instead follow the reasoning of the unpublished oral opinion in the Michigan case, Daunt v. Benson. Id.

Finally, Plaintiffs assert that "[e]ven if Plaintiffs' notice were deficient, any lack of specificity should be equitably excused." (Document No. 35, p. 16).

Defendant's "Reply In Support…" argues that Plaintiffs' contention that their presuit notice was adequate fails for two reasons. (Document No. 40, p. 1).

First, Defendant argues that contrary to Plaintiffs' position, a notice must explain *how* Defendant was violating the NVRA. (Document No. 40, pp. 1-2). Defendant contends that Plaintiffs here "relied on inaccurate statistics to support their *belief* that there was a violation." Id. Since there is no statistical threshold for a violation of the NVRA voter list-maintenance requirements, Plaintiffs' notice fails to provide Defendant with an opportunity to address the alleged violation. (Document No. 40, p. 2) (citing Scott v. Schedler, 771 F.3d 831, 836 (5th Cir. 2014) (quoting Ass'n of Cmty. Organizations for Reform Now v. Miller, 129 F.3d 833, 838 (6th Cir. 1997.

Defendant avers that Plaintiffs' cited cases, Judicial Watch v. King and Am. Civil Rights Union v. Martinez-Rivera, "cannot be squared with the appellate decisions requiring specific violations to be identified in a notice such that an elections board may attempt to correct any problems before facing a lawsuit." Id. (citing Schedler, 771 F.3d at 836 and Miller, 129 F.3d at 838). Moreover, Defendant contends that the King and Martinez-Rivera cases are distinguishable because they were "based on a misunderstanding of the NVRA and its operation." Id.

Defendant also contends that decisions Plaintiffs rely on "did not have the benefit of the Eleventh Circuit's extensive analysis in *Bellitto v. Snipes*, showing that these same statistics relied

13

Case 3:21-cv-00493-RJC-DCK   Document 44   Filed 01/24/23   Page 13 of 20

upon by the plaintiffs in those cases and Plaintiffs here do not show an NVRA violation." (Document No. 40, p. 3) (citing Bellitto v. Snipes, 935 F.3d 1192, 1208 (11th Cir. 2019)).

Defendant's second argument in the Reply asserts that Plaintiffs' notice is insufficient because it relies on "unreliable and misleading statistics." (Document No. 40, p. 30. Defendant notes that "the NVRA's required procedures for removing voters often result in this type of statistical data." Id. Defendant asks, "how could an elections agency possibly know how to change its NVRA compliance when confronted with statistics that the federal administrators of the NVRA say are consistent with compliance?" Id.

In conclusion, Defendant states that "[a]n elections agency cannot be required to disregard the obvious flaws in data presented to it to show an alleged NVRA violation," and concludes that if "the NVRA's presuit notice requirement is to serve any purpose, it must give a public agency enough information to attempt to come into compliance with the NVRA." (Document No. 40, p. 4).

The undersigned finds Defendant's arguments most compelling. In short, the undersigned agrees that Plaintiffs' Notice letter is insufficient to confer standing because it is "too vague to provide [the defendant] with 'an opportunity to attempt compliance.'" (Document No. 20, p. 11) (quoting Scott, 771 F.3d at 836 (quoting Miller, 129 F.3d at 838)).

The undersigned finds that this case is very similar to Judicial Watch, Inc. v. North Carolina State Board of Elections, et al. Both sides cite to Judicial Watch and are well aware that the undersigned found in that case that a plaintiff's reliance on high voter registration rates, without more, did not provide adequate notice/evidence of non-compliance with the NVRA. Judicial Watch, 3:20-CV-211-RJC-DCK, 2021WL 7366792 (W.D.N.C. Aug. 20, 2021). As noted by Defendant, this Court found the U.S. Election Assistance Comm'n, Election Administration and

14

Voting Survey, 2018 Comprehensive Report at 47, 49, 52, https://bit.ly/2Zlrx3L (the "EAVS 2018 Report") to be instructive. (Document No. 20, p. 13) (quoting Judicial Watch, 2021WL 7366792, at *10). The undersigned noted in Judicial Watch that the EAVS 2018 report

> advises that the data "be used with caution" and that some "states appear to have registration rates that exceed 100 percent ... because of the long time period involved in removing ineligible voting records required by NVRA." EAVS 2018 Report at pp. 47, 49; see also (Document No. 1, p. 8; and Document Nos. 1-1 and 1-2). If states should expect to see high voter registration rates, such information, without more, does not seem to provide adequate notice/evidence of non-compliance with the NVRA. Contrary to Plaintiff's assertion that a "high registration rate suggests that a jurisdiction is not removing voters who have died or moved elsewhere, as required by 52 U.S.C. § 20507(a)(4)" – the EAVS report relied upon by Plaintiff tells us to *expect* a high registration rate that may exceed 100 percent. Id.

Judicial Watch, 2021 WL 7366792, at *10.

Defendant further notes that the U.S. Election Assistance Comm'n, Election Administration and Voting Survey, 2020 Comprehensive Report at 126, 135, (the "EAVS 2020 Report") also "warns against drawing conclusions about NVRA compliance based on registration rates . . . precisely because of the lag time the NVRA requires for the removal of voters." (Document No. 20, p. 13).

Not only do Plaintiffs rely on the high registration rates that the EAVS Reports advise should be used with caution, but as noted by Defendant, "Plaintiffs' particular statistics are highly misleading and inaccurate because they compare 2016 voting-age population data to 2020 voter registration data in a State with significant population gains during the same time period." (Document No. 40, p. 4); see also (Document No. 1, pp. 8-9; Document No. 1-1, p. 4; Document No. 20, p. 14).

15

Instead of identifying "a violation" or series of violations, the Notice states that "North Carolina counties *appear* to be in violation of Section 8 of the NVRA," and the "evidence strongly *suggests* that these counties are not conducting appropriate list maintenance." (Document No. 1-1, p. 2). The NVRA addresses the right of action of a "person who is aggrieved by **a violation**" – not the suggestion of a violation or the appearance of a violation. 52 U.S.C. § 20510(b) (emphasis added). Even though Plaintiffs' Notice is vague about the alleged violation(s), it demands that Defendant "take specific actions to correct these violations" within ninety (90) days or they will bring a lawsuit. (Document No. 1-1, p. 2).

The Notice letter goes on to request that Defendant: "establish, *if one has not already been initiated*, a comprehensive and nondiscriminatory list maintenance program in compliance with federal law." (Document No. 1-1, p. 5) (emphasis added). Plaintiffs further request that

> this program must identify and remove the following categories of individuals from the official lists of eligible voters:
>
> 1. All persons who are ineligible to vote by reason of a change in residence;
> 2. Deceased individuals;
> 3. Persons who are presently incarcerated;
> 4. All other ineligible voters.

Id.[1]

As noted above, Defendant's response to the Notice explained that "North Carolina has adopted detailed statutory requirements, which are mostly found in section 163-82.14 of the General Statutes" that direct that "the State Board must carry out a 'uniform program' of list

---

[1] To the extent Plaintiffs demand that "presently incarcerated" persons be removed as eligible voters they seem to seek relief that Defendant is unable to legally provide. (Document No. 1-1, p. 5). Defendant's letter explains the State's process for removing "voters who have become ineligible due to a *felony conviction*." (Document No. 21-2, p. 4) (emphasis added); see also (Document No. 20, p. 8) and N.C.Gen.Stat. §163-82.14(c). There is no indication Plaintiffs withdrew or clarified their demand that all "presently incarcerated" persons be identified and removed as eligible voters within 90 days of May 4, 2020.

16

maintenance that is 'non-discriminatory' and complies with the Voting Rights Act of 1965, as amended, and the NVRA." (Document No. 21-2, p. 4) (citing N.C.Gen.Stat. 163-82-14(a)). Defendant's response thoroughly describes North Carolina's voter list maintenance program, including how it addresses: voters who have moved; deceased voters; and voters ineligible due to a felony conviction. See (Document No. 21-2, pp. 4-5).

To the extent Plaintiffs' Notice can be construed as including a specific alleged violation and/or demand it is – to "establish, *if one has not already been initiated*, a comprehensive and nondiscriminatory list maintenance program in compliance with federal law." (Document No. 1-1, p. 5). Defendant answered and explained that such a list maintenance program has already been established. (Document No. 21-2) (citing N.C.Gen.Stat. 163-82-14).

Plaintiffs were either unaware, or chose to ignore, that North Carolina has a List Maintenance statute that seems to address most, if not all, of the concerns in Plaintiffs' Notice. See N.C.Gen.Stat. § 163-82.14; (Document No. 1, ¶55; Document No. 1-1, p. 5). Plaintiffs do *not* allege that N.C.Gen.Stat. § 163-82.14 is inadequate to address their concerns and/or the requirements of the NVRA; nor do Plaintiffs contend that Defendant is failing to follow the requirements of the "List Maintenance" statute. See (Document Nos. 1, 1-1, 35). Neither the Notice, nor the Complaint, explains *how* Defendant is failing to make "a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(a)(4). Plaintiffs' failure to mention the North Carolina statute in their Notice, Complaint, or "…Opposition To Motion To Dismiss" is perplexing.

The undersigned also notes that Plaintiffs' Notice alleges that "36 counties appear to be in violation of Section 8 of the NVRA"; but the Complaint alleges that "40 counties are in violation of section 8." Compare (Document No. 1, p. 12 and Document No. 1-1, p. 2). Neither side's

17

submissions seem to address whether Plaintiffs are permitted to include additional alleged violations without providing Notice to Defendant. Likewise, neither the parties, nor the relevant statute, seem to address any limitation on the timing for filing a lawsuit alleging a NVRA violation.

Plaintiffs' delayed filing of this lawsuit, and especially the addition of four (4) more counties allegedly violating the NVRA, seems inconsistent with the NVRA's provision requiring written notice of the violation and allowing Defendant to correct any violation within 90 days. (Document No. 1); 52 U.S.C. § 20510. Even *if* Defendant were able to identify the alleged violations, there was certainly no opportunity to make corrections as to the four (4) additional counties named in the Complaint that were not named in the Notice.[2] See Id. at p. 7 (citing 52 U.S.C. § 20510(b)).

The Complaint also does not address whether any other "corrective" action was initiated by Defendant since the Notice was sent on or about May 4, 2020, or why Defendant's explanation of the States List Maintenance procedures was inadequate. (Document No. 1). For example, Plaintiffs did not address Defendant's contention that consistent with NVRA procedures, the North Carolina Board of Elections estimated that "380,000 voters" would be removed "*after* the 2020 general election." (Document No. 20, p. 15) (citing N.C. State Bd. of Elections, County Boards of Elections Begin Regular Voter List Maintenance Processes (Jan. 14, 2021), https://www.ncsbe.gov/news/press-releases/2021/01/14/county-boards-elections-begin-regular-voter-list-maintenance. It does not appear that Plaintiffs addressed the alleged 2021 removal of ineligible voters in the Complaint or their briefing. See (Document No. 35). Plaintiffs' Complaint does note that the Daunt v. Benson case was settled after the Michigan Director of Elections

---

[2] Plaintiffs now contend that there are forty (40) counties that violate the NVRA. Notably, neither side has alleged or explained any difference in how Defendant or the county boards handle the requirements of the NVRA differently in North Carolina's other sixty (60) counties.

18

"agreed to slate 177,000 voter registrations for cancellation."  (Document No. 1, p. 11);  see also Daunt v. Benson, 1:20-CV-522-RJJ-RSK, (Document No. 58, p. 5) (W.D.Mich., Feb. 16, 2021).

The undersigned finds Defendant's arguments for dismissal to be persuasive, and the undersigned is convinced that Plaintiffs' Notice was inadequate, and thus fatal to their standing to bring this lawsuit.  The undersigned expresses no opinion at this time as to whether Plaintiffs did, or could, establish a concrete injury-in-fact and/or a claim upon which relief may be granted if they provided adequate notice of NVRA violation(s).  If the presiding district judge agrees that the statutory lack of standing is sufficient to grant dismissal, the undersigned recommends that such dismissal be without prejudice to Plaintiffs filing a revised Notice, and *if necessary*, a new lawsuit.

**B.     Intervention**

As in Judicial Watch, Inc. v. North Carolina, et al., the undersigned finds here that proposed Defendant-Intervenors, The League of Women Voters of North Carolina and the North Carolina A. Philip Randolph Institute, have presented compelling arguments to be allowed to intervene; however, the undersigned again finds that under the current posture of the case their motion should be denied.  Judicial Watch, 2021 WL 7366792, at *11.  The undersigned recommends that proposed Defendant-Intervenors be permitted to renew their request if the Court ultimately declines to dismiss this action.

## IV. RECOMMENDATION

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that "Defendant's Motion To Dismiss" (Document No. 19) be **GRANTED**.  The undersigned recommends that this lawsuit be dismissed, without prejudice to Plaintiffs filing a renewed action, if appropriate.

**IT IS FURTHER RECOMMENDED** that "The League Of Women Voters Of North Carolina And The North Carolina A. Philip Randolph's Motion To Intervene As Defendants" (Document No. 15 ) be **DENIED AS MOOT**.

## V. TIME FOR OBJECTIONS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact, conclusions of law, and recommendation contained herein may be filed within **fourteen (14) days** of service of same. Responses to objections may be filed within fourteen (14) days after service of the objections. Fed.R.Civ.P. 72(b)(2). Failure to file objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the District Court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); United States v. Benton, 523 F.3d 424, 428 (4th Cir. 2008). Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal. Id. "In order 'to preserve for appeal an issue in a magistrate judge's report, a party must object to the finding or recommendation on that issue with sufficient specificity so as reasonably to alert the district court of the true ground for the objection.'" Martin v. Duffy, 858 F.3d 239, 245 (4th Cir. 2017) (quoting United States v. Midgette, 478 F.3d 616, 622 (4th Cir. 2007)).

**IT IS SO RECOMMENDED**.

Signed: January 24, 2023

David C. Keesler
United States Magistrate Judge